IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| KATHRYN L. PETERSON, | ) | |
| | ) | |
| Plaintiff, | ) | 4:12CV3098 |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | MEMORANDUM AND ORDER ON |
| Commissioner of the Social Security | ) | REVIEW OF THE FINAL DECISION |
| Administration, | ) | OF THE COMMISSIONER OF THE |
| | ) | SOCIAL SECURITY |
| Defendant. | ) | ADMINISTRATION |
| | ) | |

On May 14, 2012, the plaintiff, Kathryn L. Peterson, filed a complaint against the defendant, Michael J. Astrue, Commissioner of the Social Security Administration. (ECF No. 1.)[1] Peterson seeks a review of the Commissioner's decision to deny her applications for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., and for Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. See 42 U.S.C. §§ 405(g) and 1383(c)(3) (providing for judicial review of the Commissioner's final decisions under Titles II and XVI of the Act). The Commissioner has filed an answer to the complaint and a transcript of the

---

[1] Carolyn W. Colvin has since been appointed to serve as Acting Commissioner of the Social Security Administration. As Astrue's successor, Colvin is "automatically substituted as a party" in place of Astrue. Fed. R. Civ. P. 25(d).

administrative record. (See ECF Nos. 11-12.) In addition, the parties have filed briefs in support of their respective positions. (See Pl.'s Br., ECF No. 15; Def.'s Br., ECF No. 20.) I have carefully reviewed these materials, and I find that the Commissioner's decision must be affirmed.

## I. BACKGROUND

On October 28, 2008, Peterson completed an application for disability insurance benefits, and on October 31, 2008, she applied for SSI benefits. (Transcript of Social Security Proceedings (hereinafter "Tr.") at 64-65, 163-178.) The applications were denied on initial review, (id. at 64-65, 68-71), and on reconsideration, (id. at 66-67, 75-78). Peterson then requested a hearing before an ALJ. (Id. at 79-81.) The hearing was held on December 8, 2010, (e.g., id. at 26), and, in a decision dated December 27, 2010, the ALJ concluded that Peterson "has not been under a disability, as defined in the Social Security Act, from July 14, 2008, through the date of th[e] decision," (id. at 20 (citations omitted); see also id. at 12-20). Peterson requested that the Appeals Council of the Social Security Administration review the ALJ's decision. (See id. at 6.) This request was denied, (see id. at 1-3), and therefore the ALJ's decision stands as the final decision of the Commissioner.

## II. SUMMARY OF THE RECORD

On Disability Report forms, Peterson claimed that she became disabled on July 14, 2008, due to strokes that caused fatigue, concentration problems, memory problems, comprehension problems, double vision, dizziness, and weakness. (Tr. at 201.) She was born in April 1959, (id. at 165), and she has a bachelor's degree in

physics, (id. at 34). She has had experience working as a baker, a restaurant owner and manager, and a sales clerk at a computer store, among other jobs. (See id. at 36-39, 202.) At the time of the hearing before the ALJ, she was working part time as a science teacher for third and fourth grade students. (Id. at 35.)

### A. Medical Evidence[2]

On July 14, 2008, Peterson was admitted to the Swedish Medical Center in Englewood, Colorado, after suffering a stroke that caused aphasia, right-sided weakness, and double vision. (Tr. at 305.) A CT revealed "a small area of acute infarction in the right frontal opercular region," small "scattered chronic areas of infarction in the frontal and parietal regions," and "no hemorrhage or significant mass effect." (Id. at 327-328. See also id. at 306.) Her condition improved during her stay at the hospital, and "she had only very mild double vision by the time of discharge" on July 17, 2008. (Id. at 305.)

A progress note from the Perkins County Community Hospital in Grant, Nebraska, dated September 22, 2008, states, in part, as follows:

> Kathryn is . . . being seen as an outpatient after becoming diplopic this morning about two hours ago. . . . Kathy had a mitral valve replacement in Idaho about 10 years ago. Since then she has done well and has been on Coumadin. The first part of July Kathryn had a spell. She lost some function of her right side which abated after several hours. She then had a CVA affecting the whole right side of her body on July 14th. At that time she was unconscious and flaccid on the right side. CT was done which revealed a small infarct. She was then transferred to Swedish in Denver but indeed had resolved nearly fully neurologically by the time she left. While she was there she was placed on Heparin for a day or

---

[2] My review of the medical evidence emphasizes the records cited by the parties in their briefs. (See Pl.'s Br. at 4, ECF No. 15; Def.'s Br. at 3-5, ECF No. 20.)

> two and then her Coumadin restarted. After all the studies were done in Denver they felt like she was having TIA's secondary to inadequate Coumadin dosage. . . .
>
> PHYSICAL EXAM: Today her neurological symptoms are much less drastic then [sic] 2 months ago. She has diplopia but she is able to speak and think properly although she thinks she is perhaps a little slow. She has no localizing signs in her arms and legs but just has double vision.

(Id. at 336.) Peterson's physician, C.R. Colglazier, M.D., diagnosed "TIA with diplopia," "Mitral valve prosthesis," and "History of AV malformation in colon (resolved)." (Id.) Her physician noted that "[s]ince Kathryn's insurance has run out we will probably have one of my staff observe her at her own home which is only a block away from the hospital. We will observe her this afternoon. I do not think we will change or add Heparin at this point. We will increase her Coumadin appropriately if it is subtherapeutic." (Id.)

Peterson followed up with Dr. Colglazier on September 24, 2008, after she and her friends became concerned that she was "still relatively lethargic." (Id. ¶ 330.) Dr. Colglazier spoke with Peterson for approximately 40 minutes and noted that she "slowly recalls the events of July," but "does not remember much about the hospitalization in Denver." (Id.) She remembered some recent events (e.g., she remembered that she returned home relatively late from her recent trip to Kansas but was not tired, and she went jogging), but she struggled to remember her previous visit with Dr. Colglazier. (Id.) Dr. Colglazier noted that Peterson had "no localizing signs except for her diplopia," that she was "somewhat sleepy acting and slow to speak, but she [could] converse in complete sentences and make sense most of the time," and that "[s]he just seems tired." (Id.) She was advised not to run or ride her bicycle, and she was instructed to wear an eye patch and try to read. (Id.) She was also directed

4

to return to the hospital on the following day. (Id.)

Peterson was brought to the Perkins County Community Hospital via ambulance on October 25, 2008, "after becoming acutely dizzy." (Id. at 349.) A CT scan revealed "a 2.5 cm old right frontal infarct as well as generalized atrophy and several lacunar infarcts," which were all unchanged from September 24. (Id.) She was discharged in "better" condition, with her only deficits being "somewhat slow thought processes and short term memory loss." (Id.)

On October 29, 2008, Peterson visited Jose A. Cardenas, M.D., for a neurology consultation. (Id. at 367-371.) Dr. Cardenas ordered various tests and discussed neurologic warning signs with Peterson "at length." (Id. at 370.) During a follow-up on November 13, 2008, Dr. Cardenas noted that Peterson recently suffered an "episode like a panic attack." (Id. at 372.) He also noted that tests revealed asymmetric blood flow in Peterson's brain. (Id. at 374.)

Peterson followed up with Dr. Cardenas on December 18, 2008, and reported that she had not suffered any spells or episodes during the past few weeks. (Id. at 376, 378.) Imaging studies were noted to be "unremarkable," and Dr. Cardenas informed Peterson that her cerebrovascular risk factors were "well controlled." (Id. at 378.)

On January 20, 2009, Rebecca A. Schroeder, Ph.D., performed a psychological evaluation of Peterson. (Id. at 387-395.) Peterson told Dr. Schroeder that she was "unable to return to work because of her continuing memory issues and because of ongoing problems with strength and fatigue." (Id. at 388.) She also said that her 20-year-old daughter moved back home with her in October to help take care of her, but the daughter commented "that her mom does do most usual household activities on her own." (Id. at 390.) Peterson said that she had "occasional problems with

depression," and she commented that she is frustrated and depressed because she "cannot keep up with all of her responsibilities like she used to." (Id.) Dr. Schroeder administered memory tests and concluded that all of Peterson's scores were within normal limits. (Id. at 391-392.) She noted, however, that when Peterson "is in a more natural environment where there are distractions, she may have more trouble in remembering information." (Id. at 393.)

Dr. Schroeder found that Peterson's intellectual functioning was "well within average limits"; that her thinking seemed clear; that she had "well-developed communication skills"; that she was "well able to maintain a conversation"; that she was able to recover from an intentional distraction in the middle of a conversation; that there were no memory lapses during conversation; that her mood was dysphoric; that she had gone through significant stress during the past year, including her series of strokes and "her separation and divorce"; and that she has "a good social system." (Id. at 392-393.) Dr. Schroeder's report states,

> Kathryn Peterson may notice some restrictions in her activities of daily living related to her memory functioning and also related to her depressive disorder. She appears to struggle with retaining information and she is gradually learning to compensate by writing information down. Her depression may affect her energy level, which may increase feelings of fatigue and weakness. The client seems to have good social skills and appears well able to maintain social functioning. When she is under stress, she may notice increases in her feelings of dysphoria. The client seems able to sustain concentration and attention needed for most tasks, although occasionally this is an issue for her. She appears able to understand and remember most instructions, although at times she may need reminders both verbally and through written measures. She may require more than ordinary supervision when carrying out a new task. The client seems able to relate appropriately to coworkers and supervisors and appears able to adapt to changes within her environment.

(Id. at 394.) Dr. Schroeder diagnosed "Adjustment Disorder with depressed mood," "Series of strokes, TIAs, artificial heart valve," and "Moderate stressors including adjustment to medical issues, divorce." (Id.) She also assigned Peterson a current GAF score of 62. (Id.)[3] Her report concludes, "The client's prognosis for her adjustment disorder is good. The client's memory issues were not given a specific diagnosis since her functioning is still within average limits. However, the client may still notice problems with short-term memory, especially when there are distractions around her. . . . Ms. Peterson appears capable of managing her own funds." (Id. at 394-395.)

On January 31, 2009, Peterson reported to Perkins County Health Services Emergency Room for scheduled lab work. (Id. at 379.) Peterson was very lethargic, and IV fluids were administered to her. (Id.) She ate supper, and she was discharged home in stable condition and feeling better. (Id.)

## B.  Hearing Testimony

During the hearing before the ALJ on December 8, 2010, Peterson testified that she worked for one or two hours on four days per week teaching a science class at a school located in her church. (Tr. at 34-35.) Subsequently, however, she testified that she only taught twice per week. (Id. at 36. But see id. at 48 (stating that Peterson taught every day for four straight days, starting on a Monday).) She said that she

---

[3] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'" Pate-Fires v. Astrue, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) (hereinafter DSM-IV)). A GAF of 61 to 70 indicates that the individual has "[s]ome mild symptoms . . . or some difficulty in social, occupational, or school functioning . . . , but [is] generally functioning pretty well . . . ." DSM-IV at 32.

could not work full time because she lacked the energy to work a longer day and because she had a hard time remembering what she was supposed to be doing. (Id. at 37.) She explained that while working at a computer store in 2008, she suffered a stroke that contributed substantially to her disability. (Id. at 43-44.) She denied having significant physical problems after the stroke, (id. at 44), but she said she began to have a difficult time remembering things, (id. at 45). Specifically, she said that she now struggles to remember names of familiar people, and sometimes she forgets to eat. (Id. at 45, 48.) She added, however, that she has not yet had a problem remembering to get to the school to teach her class. (Id. at 48.)

Peterson testified that she did not believe that she could teach full time because she lacked sufficient energy and doubted whether she could "think[] and keep[] things straight for a lot of different classes." (Id. at 48.) She also testified that she has problems not only with memory, but also with comprehension. (Id. at 51.)

Peterson's friend, Linda Kohen, also testified at the hearing. (E.g., id. at 52.) Kohen testified that she has known Peterson for ten years, and when they first met Peterson was "a very knowledgeable, active person." (Id.) Two or two-and-a-half years ago, however, Peterson suffered a stroke that "affected [her] physically and also her memory." (Id. at 53.) Kohen said that Peterson has "improved a lot" physically, "although she still does not have . . . the same stamina she used to have." (Id. See also id. at 56-57.) She added, however, that Peterson's memory remains affected. (Id.) Kohen said that Peterson "can remember one thing and focus on that well," "[b]ut to remember a number of things to be done in a day is difficult for her." (Id. See also id. at 54-56 (describing Peterson's struggle to focus on multiple tasks at her teaching and greenhouse jobs).) Kohen also confirmed that Peterson struggles "to remember names at times." (Id. at 53-54.) In addition, Kohen said that Peterson

8

often needs help with her bills.  (Id. at 55.)

### C.  Vocational Expert's Testimony

During the hearing, the ALJ asked a Vocational Expert (VE) to assume that an individual of Peterson's age, education, and work experience was "capable of performing light work; no ladders, ropes, or scaffolds, and only occasional climbing of stairs and ramps; the [individual would] need to avoid concentrated exposure to moving machinery and unprotected heights; and the individual would be limited to simple, routine, repetitive tasks."  (Tr. at 60.)  The ALJ then asked whether this individual would be able to perform Peterson's past work."  (Id.)  The VE responded negatively.  (Id.)  The ALJ asked whether such a person could perform any other work, and the VE responded affirmatively.  (Id.)  The VE added,

> There'd be some light cleaning work.  Example DOT number would be 323.687-014.  In that area, there's at least 3,000; in the national economy, over 200,000.
>
> . . . .
>
> One other job would be like the office helper.  239.567-010. About 5,000 in the state, and over 100,000 in the national economy. Some other work could involve some assembly, like bench assembly. Example DOT number would be 706.684-042.  There's at least 1,000 in the state and over 100,000 in the national economy.  Thos[e] would be three examples.

(Id. at 60-61.)

Peterson's attorney then asked the VE whether "a person such as the claimant who has deficient memory and who lacks the energy to work a full-time job . . . can . . . be employed on a full-tome basis in the national economy."  (Id. at 62.)  The VE responded, "[I]f I'm assuming that, I would have to agree, she couldn't do full-time

9

work then." (Id.)

### D.   The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520(a); id. § 416.920(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. See 20 C.F.R. § 404.1520(a); id. § 416.920(a) In this case, the ALJ proceeded to step five and found Peterson to be not disabled. (See Tr. at 14-20.)

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b). If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b). The ALJ found that Peterson "has not engaged in substantial gainful activity since July 14, 2008, the alleged onset date." (Tr. at 14 (citations omitted).)

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c); id. § 416.920(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."); id. § 416.920(a)(4)(ii), (c); id. § 416.909. Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions";

"[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b); id. § 416.921(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 416.920(a)(4)(ii), (c). The ALJ found that Peterson "has the following severe impairments: status post transient ischemic attack/cerebrovascular accidents, prosthesis of mitral valve, and adjustment disorder with depressed mood." (Tr. at 14 (citations omitted).)

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii); see also 20 C.F.R. Part 404, Subpart P, App'x 1. If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. See 20 C.F.R. § 404.1520(a); id. § 416.920(a). The ALJ found that Peterson "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. at 15 (citations omitted).)

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC)[4] to determine whether the impairment or impairments prevent the

---

[4] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)). See also 20 C.F.R. § 416.945(a).

11

claimant from engaging in "past relevant work." See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f); id. § 416.920(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(iv), (f); id. § 416.920(a)(4)(iv), (f). The ALJ concluded that Peterson "has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except for the following nonexertional limitations that further limit the claimant's ability to perform light work: no climbing of ladders, ropes or scaffolds; occasional climbing of ramps or stairs; avoid concentrated exposure to moving machinery and unprotected heights; and is limited to performing simple, routine, and repetitive tasks." (Tr. at 16.) The ALJ also found that Peterson "is unable to perform any past relevant work." (Id. at 19 (citations omitted).)

Step five requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past. See 20 C.F.R. § 404.1520(a)(4)(v), (g); id. § 416.920(a)(4)(v), (g). If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five. See 20 C.F.R. § 404.1520(a)(4)(v), (g); id. § 416.920(a)(4)(v), (g). The ALJ wrote, "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. at 19 (citations omitted).)

### III. STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75

F.3d 414, 416 (8th Cir. 1996)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted). A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted). See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on legal error." Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000). No deference is owed to the Commissioner's legal conclusions. See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

## IV. ANALYSIS

Peterson argues that the Commissioner's decision must be reversed because the ALJ's "hypothetical question to the vocational expert did not make reference to claimant's memory and energy problems." (Pl.'s Br. at 6, ECF No. 15. See also id. at 4.) Specifically, Peterson argues,

> There is evidence in the record that the claimant has memory problems. The VE stated in answer to claimant's attorney's hypothetical that a person who has deficient memory and who lacks energy to work a full-time job cannot be employed full-time in the national economy.
>
> Ignoring claimant's memory problems and energy problems . . . constitutes prejudicial error in failing to consider all of the claimant's impairments before deciding the issue of disability. Obviously, the ALJ did not consider memory and energy problems before answering that the claimant could be employed on a full-time basis in other jobs. The ALJ had the burden of at least discussing the memory and energy problems before she could reject them. Since she did not discuss the memory and energy problems the only safe assumption for an appellate court to make is that the ALJ did not consider the memory and energy problems. The law requires that [the] ALJ consider <u>all</u> the claimant's impairments at least to the extent of rejecting them and giving the reasons for the rejection.

(<u>Id.</u> at 6-7.)

Peterson's assertion that the ALJ ignored her "memory problems and energy problems" is belied by the record. The ALJ noted that Peterson claimed to be "unable to work because of the following . . . limitations: <u>Severe memory loss</u>, where remembering even the simplest of things is difficult; <u>extreme fatigue</u>; depression; and double vision." (Tr. at 17 (emphasis added).) The ALJ then considered the record and concluded that Peterson's statements about the severity of her limitations were not fully credible. (<u>See</u> <u>id.</u> at 17-19.)

When discussing the severity of Peterson's memory loss, the ALJ noted (among other things) that Dr. Schroeder "administered a Wechsler Memory Scale III test"; that "all of [Peterson's] scores were within average limits"; and that Dr. Schroeder opined that Peterson may nevertheless "notice some problems with short term memory, especially when there are distractions around her." (Tr. at 18.) The

14

ALJ concluded, "Great weight is given to the opinions of Dr. Schroeder, as they are consistent with the evidence in the record. Additionally, the results of the memory test that was performed discount the severity of the memory problems alleged by the claimant. However, based on the findings that the claimant's memory problems still create some limitations on her, she is limited to performing simple, routine, and repetitive tasks." (Id.)

The ALJ also gave great weight to the opinions of the "[s]tate agency medical consultants," whose opinions were "highly supported by the medical evidence in the record." (Id. at 19.) Specifically, the ALJ cited a report prepared by Jerry Reed, M.D., who reviewed the record and noted that 1) Peterson "was riding a bicycle within one week of having a stroke," and 2) Peterson's strength and gait were normal despite her complaints of fatigue. (Id. at 439; see also id. at 19 (citing Tr. at 432-440).) The ALJ also cited the report of A.R. Hohensee, M.D., who noted that 1) Peterson's lethargy on January 31, 2009, was determined not to be related to "a TIA or CVA"; and 2) Peterson reported on July 1, 2009, "that she walks/jogs 1 ½ miles daily . . . [and] has no problems standing, sitting, climbing stairs, completing personal needs, doing chores or preparing meals for herself." (Id. at 443; see also id. at 19 (citing Tr. at 443-444).) The ALJ wrote, "While the evidence in the record shows that the claimant has some limitations resultant from her impairments, the evidence repeatedly demonstrates that she is capable of performing work at the . . . residual functional capacity level" set forth in the decision. (Id. at 19.)

"If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so," courts "will normally defer to the ALJ's credibility determination." Jones v. Astrue, 619 F.3d 963, 975 (8th Cir. 2010) (quoting Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010)). I find that the ALJ has given good reasons for

discounting Peterson's claims that her memory problems and fatigue prevented her from performing all work. I also find that the hypothetical question that the ALJ posed to the VE was sufficient. See Perkins v. Astrue, 648 F.3d 892, 901-02 (8th Cir. 2012) (explaining that a hypothetical is sufficient if it captures the concrete consequences of the claimant's deficiencies and sets forth impairments that are supported by substantial evidence and accepted as true).

**IT IS ORDERED** that the Commissioner of Social Security's decision is affirmed.

Dated April 22, 2013.

BY THE COURT

_/s/ Warren K. Urbom_
Warren K. Urbom
United States Senior District Judge